UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHRISTINA ANN SAULS,

      Plaintiff,

v.                                                    CASE NO. 3:19-cv-1491-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

      Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an

administrative decision denying her application for a period of disability and

disability insurance benefits ("DIB").  Following an administrative hearing

held on February 7, 2019, the assigned Administrative Law Judge ("ALJ")

issued a decision, finding Plaintiff not disabled from July 15, 2016, the

alleged disability onset date, through February 21, 2019, the date of the

ALJ's decision.[2]  (Tr. 13-27, 33-62.)  Based on a review of the record, the

briefs, and the applicable law, the Commissioner's decision is **AFFIRMED**.

---

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Doc. 16.)

[2] Plaintiff had to establish disability on or before March 31, 2019, her date
last insured, in order to be entitled to a period of disability and DIB.  (Tr. 17.)

## I.    Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff raises two issues on appeal.  Her first argument is that the

ALJ failed to articulate good cause for rejecting the opinions of her treating neurologist, Dr. Erin Doty, and her primary care physician, Dr. Rodney A. Marcom, while according significant weight to the outdated opinions of the State Agency non-examining physicians, Dr. Kathy O'Shea and Dr. Frank Walker. Plaintiff points out that the State Agency non-examining doctors did not review the records from Mayo Clinic, Dr. Doty's opinion, or the cardiology and neurology records in Exhibits 14F-24F. Plaintiff's second argument is that the ALJ failed to consider her need for a walker or other assistive device on her ability to perform full-time work. Plaintiff points out that although both Dr. Marcom and Dr. Doty opined that she needed an assistive device for occasional standing or walking, the ALJ failed to explain why he rejected the medical advice of two treating physicians and failed to make the requisite findings of fact pursuant to SSR 96-9p, especially given the nature of her diagnoses.

Defendant responds that the ALJ properly evaluated the medical opinions of record and his residual functional capacity ("RFC") assessment is supported by substantial evidence. As to Plaintiff's first argument, Defendant asserts that the ALJ gave good reasons, supported by substantial evidence, for giving little weight to the opinions of Dr. Marcom and Dr. Doty. As to Plaintiff's second argument, Defendant asserts that the ALJ was not required to incorporate Plaintiff's use of a walker into the RFC assessment,

because a walker or other assistive device was not prescribed, and the medical evidence did not document the need for such a device.  Further, although Dr. Marcom and Dr. Doty indicated that Plaintiff needed an assistive device, Defendant argues that these doctors did not support their opinions with objective medical evidence and their opinions were inconsistent with other evidence in the record, which did not reflect that a walker had been prescribed.

### A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

Although a treating physician's opinion is generally entitled to more

weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[3] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

---

[3] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017. However, because Plaintiff's application predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

### B.    Relevant Opinion Evidence

### 1.    Treating Sources

#### a.  Rodney A. Marcom, D.O., FAADEP, FACFE

On May 29, 2017, Dr. Marcom, in his capacity as Plaintiff's treating physician since November 10, 2015, completed a Physical RFC Questionnaire about Plaintiff's functional limitations.  (Tr. 598-601.)  Dr. Marcom listed the following diagnoses: tachycardia, pruritis, diabetic neuropathy, anxiety and depression, diabetes mellitus, rosacea, hypertension, dysautonomia, hypothyroidism, and anemia.  (Tr. 598.)  He noted that Plaintiff's symptoms included: palpitations, pain, dizziness, muscle spasms, nausea, vomiting, decreased concentration, muscle weakness, paresthesias, and peripheral neuropathy; and Plaintiff's clinical findings and objective signs included: multiple tender points throughout her spinal regions, decreased strength (4/5) of her extremities, and paresthesias of all extremities secondary to neuropathy.  (*Id.*)  Dr. Marcom opined that Plaintiff's impairments had lasted or could be expected to last at least twelve months and her prognosis was "fair."  (*Id.*)

Dr. Marcom estimated that Plaintiff could walk one city block without rest or severe pain, sit for thirty minutes and stand for ten minutes at one time, sit for less than two hours and stand/walk for less than two hours total in an eight-hour workday; every ten minutes she needed to include periods of

6

walking around for about five minutes each; she needed a job permitting shifting positions at will and unscheduled breaks; and she needed to use a cane or other assistive device (such as, a walker or a wheelchair) while engaging in occasional standing/walking.  (Tr. 599-600.)  Dr. Marcom further opined that Plaintiff could occasionally lift and/or carry ten pounds or less and never twenty or more pounds in a competitive work situation; she should never twist, stoop/bend, crouch/squat, or climb ladders/stairs; she could look down occasionally, turn her head to the left or right or hold it in a static position rarely, and should never look up; her pain was severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks; she was incapable of even low stress jobs due to chronic pain, incoordination, weakness, low concentration, and inability to tolerate more than simple, uncomplicated tasks; she could use her hands and fingers ten percent of the time and her arms five percent of the time during an eight-hour workday; and her significant limitations with reaching, handling, or fingering were due to her neuropathy.  (Tr. 599-601.)  Dr. Marcom opined that Plaintiff's impairments were likely to produce "good days" and "bad days," and she was likely to be absent from work as a result of her impairments or treatment more than four days per month.  (Tr. 601.)

### b.  Erin Doty, M.D.

On June 30, 2017, Dr. Doty, Plaintiff's treating neurologist since July

14, 2016, completed a Peripheral Neuropathy RFC Questionnaire about Plaintiff's functional limitations.  (Tr. 819-23.)  Dr. Doty noted that Plaintiff's diagnosed impairments included peripheral neuropathy, autonomic neuropathy, orthostatic tachycardia, delayed gastric emptying, and neuropathic pain; that they had lasted or could be expected to last at least twelve months; and that they were "permanent and [might] worsen over time." (Tr. 819.)  She listed the following symptoms and clinical findings: pain, postural hypotension, weakness, sensory loss, chronic fatigue, chest pain, palpitations/tachycardia, painful paresthesia in the bilateral hands and feet (which Plaintiff described as severe), tremor, dizziness, abdominal pain, and early satiety.  (*Id.*)  Dr. Doty indicated that Plaintiff's symptoms have interfered with or reduced her ability to attend to, persist in, and complete tasks.  (Tr. 820.)

Then, Dr. Doty estimated that Plaintiff could walk zero blocks without rest or severe pain, sit for ten minutes and stand for five minutes at one time, sit for less than two hours and stand/walk for less than two hours total in an eight-hour workday; every ten minutes she needed to include periods of walking around for about five minutes each; she needed a job permitting shifting positions at will and unscheduled breaks due to muscle weakness, chronic fatigue, and pain/paresthesias.  (Tr. 820-21.)  Dr. Doty opined that Plaintiff needed to use a cane or other hand-held assistive device while

engaging in occasional standing/walking.  (Tr. 821.)  She also opined that Plaintiff should rarely lift and/or carry less than ten pounds and never ten or more pounds in a competitive work situation; she should rarely twist and stoop/bend, and never crouch/squat; she could use her hands/fingers/arms only ten percent of the time during an eight-hour workday; her pain was severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks; and her upper extremity limitations were due to pain/paresthesias, muscle weakness, and sensory loss/numbness.  (Tr. 821-22.)  Dr. Doty did not estimate how many days per month Plaintiff would likely be absent from work as a result of her impairments or treatment, but she noted that "presently all days are equally bad" for Plaintiff.  (Tr. 822.)

## 2.  Examining Source

On April 18, 2017, Plaintiff was examined by William V. Choisser, M.D., a family/general practice physician, at the request of the Social Security Administration.  (Tr. 481-82.)  He summarized Plaintiff's complaints and medical history as follows:

> [Plaintiff] describes some unusual medical conditions including a diabetic autonomic dysfunction along with postural orthostatic tachycardia where her heart rate will increase when she is standing.  She takes metoprolol for heart rate control but there is no diagnosis of heart disease.  She is on losartam for hypertension.  She's had adult onset diabetes since her pregnancy with of [sic] fairly well-controlled A-1 C on metformin 1000 mg

daily.  She complains of numbness and tingling in [sic] spasms in her feet and her hands.  She is right-hand dominant and able to pick up small objects with the fingers of either hand.  She has difficulty walking more than a block because of increased heart rate along with dizziness and a near syncopal type feeling.  Standing is limited to 20 minutes at a time.  She is able to sit for up to an hour in an upright chair but then she has to change positions.  She is able to lift up to 20 pounds on a good day[,] but she cannot bend and perform repetitious lifting.  Other medications include Cymbalta 90 mg a day and she takes Aleve for pain.  She is on BuSpar 5[]mg three times a day for anxiety.

(Tr. 481.)

Dr. Choisser's physical examination was generally normal:

[Plaintiff's] height is 70 inches with a weight of 207 pounds.  Her blood pressure is 120/80 with a resting heart rate of 100.  . . .  In general[,] she is a depressed appearing white female who sits on the examining table in a cross-leg fashion.  . . .

Her abdomen is soft with no enlargement of her liver and spleen and no palpable mass.  Her extremities have good pulses[,] no edema.  She has full range of motion of her hips[,] knees and ankles.  She [has] full range of motion of her upper extremities.  Her grip strength is normal and finger to nose testing is normal.  Her deep tendon reflexes are normal [and] the Tinel test is negative.  Her gait appears normal.  She is slightly unsteady on heel to toe walking but does not fall.  Her Romberg is negative.  Her back flexes 90º.  She is able to squat to the floor and stand without assistance.  She is able to perform these exercises with a heart rate of 102 right after exercise.  Her mental status shows that she is alert and oriented and able to give a fairly good history with no evidence of psychosis.

(Tr. 481-82.)  His impression included history of tachycardia and

hypertension, history of near-syncope, and adult onset diabetes with fairly

good control.  (Tr. 482.)

### 3.    State Agency Non-Examining Sources

On April 25, 2017, based on a review of the records available as of that date, Dr. O'Shea completed a Physical RFC Assessment of Plaintiff's abilities. (Tr. 74-78.)  Dr. O'Shea opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; could sit for about six hours and stand and/or walk for about four hours in an eight-hour workday; could frequently balance, stoop, kneel, crouch, and climb ramps and stairs; could occasionally crawl; should never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to extreme cold/heat, wetness, humidity, noise, vibration, fumes, odors, dusts, etc.; and should avoid even moderate exposure to hazards.  (Tr. 74-76.)

On July 20, 2017, based on a review of the available records (including Dr. Marcom's opinions), Dr. Walker completed a Physical RFC Assessment of Plaintiff's abilities, essentially confirming Dr. O'Shea's opinions.  (Tr. 91-95.)

### C.    The ALJ's Decision

The ALJ found at step two of the sequential evaluation process[4] that Plaintiff had the following severe impairments: type II diabetes mellitus with peripheral neuropathy, anxiety, depression, and tachycardia with near

---

[4] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4).

syncope.  (Tr. 18.)  Further, the ALJ found that Plaintiff had the RFC to

perform sedentary work[5] with the following limitations:

> [The claimant] can never climb, balance, kneel, crouch or crawl.
> The claimant can frequently handle and finger.  She should have
> no concentrated exposure to extreme heat and never have
> exposure to moving mechanical parts or unprotected heights.
> She is limited to performing simple tasks with little variation
> that take a short time to learn (up to and including 30 days); i.e.,
> jobs with a Specific Vocational Preparation (SVP) level of 1 or 2.
> The claimant is able to deal with the changes in a routine work
> setting.

(Tr. 20-21.)

In making this finding, the ALJ discussed Plaintiff's subjective

complaints, the objective medical findings, and the records and opinions of

treating, examining, and non-examining sources.  (Tr. 21-25.)  The ALJ

addressed Plaintiff's testimony as follows:

> The claimant is 34 years old.  With regards to her diabetes, she
> said her blood sugar is controlled.  The claimant testified she has
> neuropathic pain from her toes to her mid-thigh [sic], in both of
> her arms and hands and in her fingertips.  She stated she has
> difficulty performing fine motor activities and that her ability to
> stand and walk is affected by the pain in her feet.  She reported
> she can stand and walk about five minutes with a walker and
> without a walker about two minutes; she also indicated she could

---

[5] By definition, sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles, like docket files, ledgers, and small tools; it involves sitting, but walking and standing are also required occasionally. 20 C.F.R. § 404.1567(a); SSR 83-10 ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.").  "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."  SSR 83-10.

walk up to 100 feet before she needs to sit.  The claimant testified she can sit up to 20 minutes at a time[] and lift and carry no more than five pounds.

The claimant stated that the longer she is upright[,] the higher her blood pressure gets; she also indicated having significant brain fog and dizziness.  She said she feels like she cannot process anything and that she has difficulty with even remembering her children's names.  When asked about a typical day, the claimant stated she checks on her children, they are old enough to care for their own needs, she said she cares for her personal needs, she drives her children to school and she lies down for about 90% of the day.  She reported she has a housekeeper to take care of the household chores.  As to her personal care, she said she showers once a week and uses a seat; the claimant also stated she has to lie down to recover after a shower.  The claimant testified she has groceries delivered and that she goes to the grocery store about twice per month and uses an electric cart to get around.  She indicated she has trouble sleeping and she said she uses a walker outside of her home for ambulating.

(Tr. 21.)

After addressing the medical evidence, the ALJ found that Plaintiff's

statements about her functional limitations were not entirely consistent with

the medical and other evidence in the record.  (Tr. 23.)  The ALJ explained:

The claimant's diabetes with peripheral neuropathy and tachycardia are not as severe or disabling as the claimant has alleged.  The medical evidence indicates these conditions are well controlled with medication and no more than conservative treatment has been recommended.  Physical examinations noted in the medical discussion . . . have been largely benign.  Additionally, objective testing discussed above show[s] the claimant does have neuropathy and orthostatic intolerance.  However, no severe findings are noted on any objective test in the record.  She testified she is able to drive her children to school and shop for groceries using an electric cart.  The claimant also

13

> reported she sits outside and talks to neighbors daily; she said
> she goes to church and the pharmacy on a regular basis.  Further,
> she indicated she can sit as long as she can readjust her position
> every so often (Exhibits 4E, 5E, 6E, 10E).  The claimant's
> husband reported she could care for her personal needs without
> assistance, make simple meals, do laundry, drive and shop for
> food and clothes (Exhibit 9E).  All of these activities are
> consistent with an ability to perform work with the [RFC]
> assessed above.

(*Id*.)

The ALJ then addressed the medical opinion evidence and gave

"significant weight" to the opinions of the State Agency non-examining

doctors for the following reasons:

> First, these are disability specialists who had the bulk of the
> evidence from the treating sources and consultative examiners
> that now comprise the official record in this case available for
> their review.  They considered all of the objective facts at the
> time they rendered their opinion.  Secondly, though they did not
> have at their disposal the claimant's testimony, that testimony
> specifically as it relates to the claimant's activities of daily living,
> was consistent with the [RFC] opined by the reviewing doctors to
> a significant degree.  Finally, the evidence in total does support
> in general the conclusions put forth by the State Agency doctors.
> The evidence is part of the record and entitled to the same
> probative value accorded "expert opinion" evidence.

(Tr. 24.)  However, the ALJ gave "no weight" to the conclusions of the State

Agency psychologists who opined that Plaintiff had no severe mental

impairments, because their opinions were inconsistent with "evidence

available at the hearing level."  (*Id*.)

Further, the ALJ gave "little weight" to Dr. Marcom's opinions

regarding Plaintiff's functional limitations.  (*Id.*)  The ALJ stated:

> Dr. Marcom's opinions . . . are inconsistent with his treatment
> records and the medical record as a whole.  His physical
> examinations of the claimant were largely unremarkable with
> some decreased range of motion and decreased sensation noted.
> Nerve conduction studies confirm the claimant does have
> neuropathy; however, these reports do not indicate the same is as
> severe as she has alleged.

(*Id.*)  Similarly, the ALJ gave "little weight" to Dr. Doty's opinions, reasoning

that "they [were] also not consistent with her objective findings or the

objective medical testing in the record" as "her physical examinations were

overall benign and her findings were largely based on the claimant's

subjective reports of pain."  (Tr. 25.)

Then, at step four, the ALJ determined that Plaintiff was unable to

perform any of her past relevant work.  (*Id.*)  However, at the fifth and final

step of the sequential evaluation, the ALJ determined, after considering

Plaintiff's age, education, work experience, RFC, and the testimony of the

Vocational Expert ("VE"), that there were jobs existing in significant

numbers in the national economy that Plaintiff could perform, such as an

addresser, a cutter and paster, and a document preparer.  (Tr. 26-27.)  All of

these representative occupations are sedentary, unskilled, with a Specific

Vocational Preparation ("SVP") of 2.  (*Id.*)

### D.   Analysis

The Court finds that the ALJ gave good reasons, supported by

substantial evidence, for according little weight to the opinions of Dr. Marcom and Dr. Doty regarding Plaintiff's functional limitations.  First, Dr. Marcom's opinions were inconsistent with his treatment records and the medical record as a whole.  As the ALJ observed, Dr. Marcom's physical examinations were largely unremarkable with some decreased range of motion and decreased sensation.  (*See, e.g.*, Tr. 384-85 (noting, as of June 22, 2016, numbness and tingling, but otherwise normal examination; also noting that Plaintiff's neuropathy was "progressing to where she ha[d] muscle spasms in her thighs and progressive weakness in her left hand"); Tr. 387 (noting, as of July 14, 2016, numbness, tingling, elevated blood pressure, and rapid heart rate, but otherwise normal examination); Tr. 390 (noting, as of August 9, 2016, numbness and tingling, but otherwise normal examination); Tr. 393 (noting, as of September 15, 2016, numbness, tingling, elevated blood pressure, and rapid heart rate, but otherwise normal examination); Tr. 396 (noting, as of November 2, 2016, numbness, tingling, elevated blood pressure, and rapid heart rate, but otherwise normal examination); Tr. 402 (noting, as of November 29, 2016, numbness, tingling, elevated blood pressure, rapid heart rate, and some cold symptoms, but otherwise normal examination); Tr. 406 (noting, as of February 21, 2017, numbness, tingling, elevated blood pressure, and rapid heart rate, but otherwise normal examination); Tr. 409 (noting, as of March 7, 2017, numbness, tingling, elevated blood pressure, and rapid

16

heart rate, but otherwise normal examination); Tr. 496 (noting, as of March 22, 2017, numbness, tingling, elevated blood pressure, and rapid heart rate, but otherwise normal examination); Tr. 492-93 (noting, as of May 25, 2017, numbness, tingling, elevated blood pressure, rapid heart rate, mildly tender neck with decreased range of motion, and 4/5 reduced muscle strength[6]); Tr. 816-18 (noting, as of August 2, 2017, numbness, tingling, mildly tender neck with decreased range of motion, 4/5 reduced muscle strength, and increased pain globally); Tr. 813-15 (noting, as of October 13, 2017, numbness, tingling, mildly tender neck with decreased range of motion, 4/5 reduced muscle strength, and increased pain globally); Tr. 811-12 (noting, as of October 30, 2017, numbness, tingling, mildly tender neck with decreased range of motion, 4/5 reduced muscle strength, and increased pain globally); Tr. 805-06 (noting, as of December 26, 2017, numbness, tingling, mildly tender neck with

---

[6] At this visit, Dr. Marcom discussed Plaintiff's disability paperwork and noted:

> Examination reveals multiple segmental vertebral rotational abnormalities throughout the CTLS regions with increased tissue and muscle tension and tender points in the paravertebral musculature, decreased [range of motion] in flexion, extension, rotation and side bending in all areas.
> . . .
> The patient has been unable to work since May 2016 due to progressive polyneuropathy.  She cannot drive longer than 30 minutes before her limbs start to shake; she cannot walk further than 1 city block, even with the walker, before having to stop.  She can sit for 30 minutes before needing to lay down.  She can stand for 10 minutes before needing to lay down.  She cannot carry more than 10 pounds.

(Tr. 493.)

decreased range of motion, 4/5 reduced muscle strength, and increased pain globally, but also noting that the treatment was "working well"); Tr. 802-03 (noting, as of March 19, 2018, numbness, tingling, mildly tender neck with decreased range of motion, 4/5 reduced muscle strength, and increased pain globally); Tr. 799-800 (noting, as of May 1, 2018, numbness, tingling, mildly tender neck with decreased range of motion, 4/5 reduced muscle strength, and increased pain globally); Tr. 795-97 (noting, as of August 23, 2018, numbness, tingling, mildly tender neck with decreased range of motion, 4/5 reduced muscle strength, and increased pain globally, but also significant improvement in Plaintiff's polyneuropathy and post-traumatic stress disorder ("PTSD") as a result of taking THC and CBD oil[7]); Tr. 792-94 (noting that on September 20, 2018, Plaintiff presented for paperwork to be filled out in connection with her driver's license due to a single dizziness episode resulting from "heat exposure and moving around too much"); Tr. 789-91 (noting that on October 16, 2018, Plaintiff presented for paperwork to be filled out for the Department of Children and Families in order to be licensed as a foster

---

[7] In Claimant's Recent Medical Treatment form, completed on November 8, 2018, Plaintiff stated that by February and March of 2018, she was treated with "a combination of prescription medications and medical marijuana which had drastically improved [her] ability to function," she was able to babysit part-time from home, and she was Dr. Marcom's "biggest success story to date!" (Tr. 273.) In Claimant's Medications form, also completed on November 8, 2018, Plaintiff stated that the medical marijuana helped treat her PTSD, anxiety, nerve pain, and postural orthostatic tachycardia syndrome. (Tr. 275.)

parent in light of taking medical marijuana; that her diabetes was under control; and that her polyneuropathy and PTSD were controlled by medical marijuana in conjunction with her other prescriptions); Tr. 786-88 (noting that on November 28, 2018, Plaintiff showed signs of a respiratory syncytial virus ("RSV"), to which she had been exposed by the child she babysat); Tr. 783-85 (noting, as of December 27, 2018, numbness, tingling, elevated blood pressure, mildly tender neck with decreased range of motion, 4/5 reduced muscle strength in the lower extremities and the right upper extremity, and recommending that Plaintiff continue "taking her medical marijuana to help with her increasing neuropathy"); Tr. 779-81 (noting that on January 23, 2019, Plaintiff presented for a refill of the medical marijuana, which was "working great").)

Further, the results of the diagnostic tests did not seem to support the severe limitations assessed by Dr. Marcom.  As the ALJ noted, although Plaintiff's neuropathy was confirmed by nerve conduction studies, those studies did not indicate the condition was as severe as alleged.[8]  (*See* Tr. 301-02 (noting that the EMG, dated August 12, 2016, revealed "[c]hronic axonal sensorimotor polyneuropathy"); Tr. 297-98 (noting that the electrodiagnostic

---

[8] Of note, although Plaintiff testified that typing, writing, or even holding her phone caused/exacerbated her symptoms, the Function Report completed by her husband on June 29, 2017 indicates that Plaintiff's social activities include daily texting, online chats, and playing video games.  (Tr. 235; *see also* Tr. 246.)

study, dated January 27, 2017, revealed "evidence of a sensorimotor polyneuropathy of [the] bilateral upper extremities"); *cf.* Tr. 394 (opining that the nerve conduction study showed "extensive peripheral damage due to [Plaintiff's] diabetes with both fine and gross motor skills").)

The ALJ's evaluation of Dr. Doty's opinions is also supported by substantial evidence.  As the ALJ observed, Dr. Doty's opinions were also inconsistent with her physical examinations, which were "overall benign," and her findings seemed to be based on Plaintiff's reports of pain.  (*See* Tr. 292-94 (noting a normal physical examination on July 14, 2016); Tr. 289-90 (noting a normal physical examination on August 29, 2016, even though Plaintiff was diagnosed with peripheral neuropathy due to diabetes and possible autonomic neuropathy); Tr. 285-86 (noting a normal physical examination on December 22, 2016, but recommending "NCV/EMG of [the] hands to assess/document neuropathy severity" in light of Plaintiff's complaints); Tr. 444-45 (noting a normal physical examination on March 6, 2017, even though Plaintiff was diagnosed with peripheral neuropathy due to diabetes with probable autonomic neuropathy and she reported "an increase in neuropathic pain despite current therapy"); Tr. 509-11 (noting a normal physical examination on June 7, 2017 despite reporting worsening of Plaintiff's condition).)  In addition, the ALJ properly observed that Dr. Doty's opinions were inconsistent with the objective medical testing in the record.

20

(*See, e.g.*, Tr. 297-98, 301-02, 356, 358, 656, 699, 742, 828.)

Further, substantial evidence in the record supports the ALJ's conclusion that Plaintiff's diabetes with peripheral neuropathy and tachycardia were well controlled with medication. (*See, e.g.*, Tr. 342, 347, 354, 654, 723.) Also, as the ALJ observed, Plaintiff's daily activities were consistent with the RFC assessment. (*See, e.g.*, Tr. 232-35, 243-46, 668 (observing that Plaintiff walked at a steady pace for six minutes without any stops or interruptions).)

Based on the foregoing, substantial evidence supports the ALJ's decision to give little weight to the opinions of Dr. Marcom and Dr. Doty regarding Plaintiff's functional limitations. Although the ALJ gave significant weight to the opinions of Dr. O'Shea and Dr. Walker, who did not have the benefit of reviewing the entire medical record, the ALJ nevertheless assessed greater limitations on Plaintiff's functioning than the two State Agency doctors who opined that Plaintiff was capable of performing light work. As such, any error in the ALJ's evaluation of the State Agency doctors' opinions was at most harmless.

Plaintiff's second argument is that the ALJ failed to consider her need for a walker or other assistive device on her ability to perform full-time work. While both Dr. Marcom and Dr. Doty opined that Plaintiff needed a cane or other assistive device for occasional standing or walking, the ALJ gave little

21

weight to these opinions and, as shown above, his conclusion is supported by substantial evidence.[9]  Plaintiff also argues that the ALJ failed to make the requisite findings of facts pursuant to SSR 96-9p.  Under SSR 96-9p, "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."

Here, aside from Dr. Marcom's and Dr. Doty's RFC Questionnaires, there is no other medical documentation establishing the need for a hand-held assistive device.  However, even accepting Dr. Marcom's and Dr. Doty's opinions that Plaintiff needed a cane for occasional standing or walking, these opinions are not necessarily inconsistent with the ability to perform sedentary work.  *See* SSR 96-9p ("Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may

---

[9] In a Function Report, dated February 11, 2017, Plaintiff stated that Dr. Marcom "highly recommended [the] use of [a] walker and [a] wheelchair for long distances." (Tr. 209.)  The Function Report completed by Plaintiff's husband on June 29, 2017 also indicates that a walker and a wheelchair were "[n]ot prescribed but recommended by the doctor."  (Tr. 237; *see also* Tr. 248.)

still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand.").

## III.   Conclusion

The Court does not make independent factual determinations, re-weigh the evidence, or substitute its decision for that of the ALJ.  Thus, the question is not whether the Court would have arrived at the same decision on *de novo* review; rather, the Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence.  Based on this standard of review, the Court concludes that the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act for the time period in question is due to be affirmed.

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **AFFIRMED**.

2.     The Clerk of Court is directed to enter judgment consistent with this Order, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, on February 22, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record